IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Lynn Freeman, on behalf of herself and all others similarly situated, | ) ) ) | C.A. No. 1:21-cv-03798-DCC |
| Plaintiff, | ) ) ) | |
| v. | ) ) | **OPINION AND ORDER** |
| Progressive Direct Insurance Company, | ) ) ) | |
| Defendant. | ) ) ) | |

This matter is before the Court on Defendant's Motions to Exclude Declarations and Reports and Testimonies of Expert Witnesses and Plaintiff's Motion for Class Certification. ECF Nos. 50, 57, 58, 59, 60, 100. These Motions have been fully briefed.[1] ECF Nos. 61, 73, 75, 76, 77, 80, 82, 93, 94, 95, 99, 106, 110, 125. The Court held two hearings on Defendant's Motions and the Notices of Supplemental Authority filed by both parties.[2] ECF Nos. 125, 152. For the reasons set forth below, Defendant's Motions are denied except Defendant's Motion to Exclude the Report and Testimony of Todd Caputo and Kirk Felix, which is granted in part and denied in part. Plaintiff's Motion for Class Certification is granted.

---

[1] Also before the Court are the parties' various supplements and replies to such. ECF Nos. 117, 124, 126, 127, 128, 132, 133, 137, 138, 139, 140, 141, 142, 143, 144, 145, 147, 148, 150, 151, 154, 155, 156, 157.

[2] The second hearing was limited to the supplemental authorities filed with respect to the Motions to Exclude.

## BACKGROUND

Plaintiff alleges that Defendant breached her insurance policy by paying less than the actual cash value ("ACV") of her totaled 2020 Chevrolet Equinox.[3]  ECF No. 1-1. Plaintiff purchased comprehensive and collision insurance underwritten by Defendant ("the Policy").  ECF No. 61-1.  The Policy provided that Defendant would "pay for sudden, direct, and accidental loss" for the covered vehicle up to the ACV.  *Id.* at 25, 27.  The Policy states that the ACV will be calculated "by the market value, age, and condition of the vehicle at the time the loss occurs."  *Id.* at 31.  The Policy further states that Defendant "may use estimating, appraisal, or injury evaluation systems to assist [it] in adjusting claims under this policy and to assist us in determining the amount of damages, expenses, or loss payable under this policy," and that "[s]uch systems may be developed by [Defendant] or a third party and may include computer software, databases, and specialized technology."  *Id.* at 36.  The Policy also provided Plaintiff an opportunity to "demand an appraisal of the loss" or to "submit a disputed property damage claim to arbitration."  *Id.* at 25, 32.  The Policy does not require the use of any specific methodology to estimate the ACV.

On May 11, 2021, Plaintiff's covered vehicle was damaged in an accident.  ECF No. 1-1.  Defendant's adjuster concluded that it was an "obvious total loss."  *Id*.  Defendant estimated the ACV by using an in-person evaluation and a third-party software program,

---

[3] Throughout this case, there are several documents and portions of documents that have been filed under seal.  Where a portion of the document has been sealed, the Court intends to cite to the unsealed document.  Where the entire document has been sealed, the Court intends to cite to the sealed document.

WorkCenter Total Loss ("WCTL").  ECF No. 70-1 at 11–12.  According to Philip Kroell,[4] [redacted].  ECF No. 69-1 at 2–3.

WCTL first generates a "base value."  WCTL begins by identifying recently sold or listed-for-sale vehicles in the relevant market and adjusts the prices to account for vehicle disparities.  ECF Nos. 69-1 at 5–7; 70-1 at 17–18.  If available, WCTL will rely on as many as [redacted] comparable vehicles.  ECF No. 69-2 at 11.  In Plaintiff's case, WCTL identified three comparable vehicles.   ECF No. 1-1 at 21–22.  Thereafter, the software program adjusts the list prices to reflect differences in the vehicle; for example, differences in equipment packages or options.  ECF No. 70-1 at 17–18.

WCTL applies a projected sold adjustment ("PSA") to the advertised price of comparable vehicles due to the belief that used vehicles usually sell for less than the list price.  *Id.* at 13, 21.  WCTL calculates the PSA[5] based on [redacted].   ECF No. 69-5 at 3.  After applying the adjustments, the adjusted prices for the comparable vehicles are averaged to create a "base value."  ECF Nos. 70-1 at 125; 70-3 at 145–46.   In Plaintiff's case, WCTL produced a base value of $20,531.63.  *Id.* at 122.

The base value is then adjusted based on the specifics of the covered vehicle.  ECF Nos. 70-1 at 125; 70-3 at 146.  Defendant prepares a settlement summary, including the market value from the applicable WCTL report, taxes and fees, and deductible, and calculates the final amount to be paid to the insured.   ECF No. 70-1 at 21, 122.

---

[4] Kroell is identified as the corporate representative for Mitchell International, Inc. ("Mitchell").  ECF No. 70-3 at 2.

[5] [redacted]

3

Plaintiff contends that Defendant's use of PSAs constitutes a breach of its contractual duty to pay her the ACV of her vehicle. ECF No. 50. She contends that the use of PSAs has led to a systemic undervaluing of totaled vehicles insured by Defendant. Plaintiff seeks to certify the following class of individuals:

> All persons who made a first-party claim on a policy of insurance issued by Progressive Direct Insurance Company to a South Carolina resident who, from October 15, 2018 through the date an order granting class certification is entered, received compensation for the total loss of a covered vehicle, where that compensation was based on an Instant Report prepared by Mitchell (i.e. Report Code = "COMP") and the actual cash value was decreased based upon Projected Sold Adjustments to the comparable vehicles used to determine actual cash value.

*Id*. at 3.

The Court will first address the Motions to Exclude followed by the Motion for Class Certification.

## **DEFENDANT'S MOTIONS TO EXCLUDE**

### ***Applicable Law***

#### **Federal Rule of Evidence 702**

The admission of expert testimony is governed by Federal Rule of Evidence 702, which provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

4

(b)the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

*Id.*

"Before a witness may be permitted to provide expert testimony, she must be qualified as an expert."  *United Prop. & Cas. Ins. v. Couture*, 639 F. Supp. 3d 590, 597 (D.S.C. 2022) (citing *Barnthouse v. Wild Dunes Resort, L.L.C.*, C.A. No. 2:08-CV-2546-PMD, 2010 WL 3169358, at *3 (D.S.C. Aug. 5, 2010)).   "When determining if an expert's qualifications are sufficient under *Daubert*, the court should 'consider the proposed expert's full range of experience and training,' not just h[er] professional qualifications." *Id.* at 597–98 (quoting *Belk, Inc. v. Meyer Corp.*, 679 F.3d 146, 162 (4th Cir. 2012)).   In addition, "[c]ourts have generally found experts to lack the requisite qualifications only when the proposed expert clearly has no relevant qualifications."   *Id.* at 598 (citing *Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 799 (4th Cir. 1989)).

"Rule 702 . . . 'imposes a special gatekeeping obligation on the trial judge' to 'ensur[e] that an expert's testimony both rests on a *reliable* foundation and is *relevant* to the task at hand.'"  *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 281 (4th Cir. 2021) (quoting *Nease v. Ford Motor Co.*, 848 F.3d 219, 229–30 (4th Cir. 2017) (citation omitted)).   "Reliability is a 'flexible' inquiry that focuses on 'the principles and methodology' employed by the expert."  *Id.* (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S 579, 594–95 (1993)).   "Specifically, district courts must ensure that an expert's opinion is 'based on scientific, technical, or other specialized *knowledge* and not on belief

or speculation.'" *Id.* (quoting *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999)).

An expert witness's opinion "is relevant if it has 'a valid scientific connection to the pertinent inquiry.'" *Id.* (quoting *Belville v. Ford Motor Co.*, 919 F.3d 224, 232 (4th Cir. 2019)). "Relevant evidence, of course, is evidence that helps 'the trier of fact to understand the evidence or to determine a fact in issue.'" *Nease*, 848 F.3d at 229 (quoting *Daubert*, 509 U.S. at 591).

On December 1, 2023, Rule 702 was amended "to clarify and emphasize that the expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule." Fed R. Evid. 702 Advisory Committee's Notes to 2023 Amendment. In addition, "Rule 702(d) [was] amended to emphasize that each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology." *Id.* The above comments accompanying the 2023 Amendment to Rule 702 indicate that the Amendment was made to clarify the requirements of Rule 702, not to make substantive changes. *See id.*

### ***Discussion***

The Court has reviewed the parties' submissions and considered the arguments contained therein. As an initial matter, Plaintiff argues that Defendant's Motions are premature. ECF No. 76 at 9. In the Fourth Circuit, "there is no controlling precedent which dictates whether to conduct a *Daubert* analysis at the class certification stage or how focused or full that analysis should be." *Childress v. JPMorgan Chase & Co.*, No. 5:16-CV-298-BO, 2019 WL 2865848, at *2 (E.D.N.C. July 2, 2019). However, district

courts in the Fourth Circuit have been "persuaded by authorities which have concluded that where a movant has proffered expert testimony in support of its motion for class certification, and such testimony is critical to the issue of class certification, a full *Daubert* inquiry is appropriate." *Id.*; *see also Robinson v. Nationstar Mortg. LLC*, No. 14-3667, 2019 WL 4261696, at *13 (D. Md. Sept. 9, 2019). Moreover, other courts considering similar motions with respect to class certification have found that Defendant's Motions are not premature at the class certification stage, and the Court agrees. *See, e.g., Bowens v. Progressive Universal Ins. Co.*, C.A. No. 22-cv-364-pp, 2024 WL 1254352, at *3 (E.D. Wisc. Mar. 24, 2024) (stating that "[a] full *Daubert* analysis is warranted where the opinions are critical to the court's ruling") (citing *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 812–13 (7th Cir. 2012)). Upon review, the Court agrees with this approach. The Court finds that Plaintiff's proffered expert testimony is critical to the issue of class certification; thus, Defendant's Motions are not premature.

**Joseph Phillips**

Plaintiff offers a Declaration from Phillips in support of her Motion for Class Certification. *See* ECF No. 50-12. Defendant seeks to exclude the Declaration, but Plaintiff clarifies that "Phillips is not being offered as an expert witness nor will he testify at trial." ECF Nos. 57-1 at 6; 75 at 4. As a result, Rule 702 is inapplicable to the admissibility of the Declaration. *See Romeo v. Antero Res. Corp.*, C.A. No. 1:17-CV-88, 2020 WL 1430468, at *2 (N.D.W. Va. Mar. 23, 2020) (stating that "Rule 702 governs the admissibility of *expert witness* testimony") (emphasis added). Thus, the Court will construe Defendant's Motion as a Motion to Strike under Federal Rule of Civil Procedure 12(f). Under Rule 12(f), "the court may strike from a pleading an insufficient defense or

any redundant, immaterial, impertinent, or scandalous matter." *Id.* "Although the Federal Rules of Civil Procedure do not provide criteria for the admissibility of affidavits or declarations used to address questions of class certification, personal knowledge is important to the requisite analysis." *Romeo*, 2020 WL 1430468, at *5 (citing *Souter v. Equifax Info. Servs. LLC*, 299 F.R.D. 126, 129–31 (E.D. Va. 2014)).

Here, Phillips' Declaration is admissible as support of Plaintiff's Motion for Class Certification. Courts elsewhere have relied on declarations in deciding motions for class certification. *See, e.g., Villanueva v. Liberty Acquisitions Servicing, LLC*, 319 F.R.D. 307, 315 (D. Or. 2017). In addressing whether a declaration is admissible for the purpose of class certification, "personal knowledge is important to the requisite analysis." *Romeo*, 2020 WL 1430468, at *5 (citing *Souter*, 299 F.R.D. at 129–31). In his Declaration, Phillips asserts that he used text-to-spreadsheet software to "identify the totaled vehicle whose value is being estimated, the number of comparable vehicles used as part of the valuation, and the projected sold adjustment amount, if any, applied to each comparable vehicle." ECF No. 50-12 at 2–3. Phillips also asserts that "I am over the age of majority and make this declaration freely, voluntarily, and based on my *personal knowledge* of the facts set forth therein." ECF No. 50-12 at 2 (emphasis added). Phillips' assertion that he has personal knowledge concerning the present case is further supported by his statement that "I have reviewed the Instant Reports used by Progressive in this case, which includes a given number of comparable vehicles." *Id*. Accordingly, Defendant's Motion to Exclude the Declaration of Joseph Phillips is denied.

**Kirk Felix**

Plaintiff offers the Report and testimony of expert witness Felix in support of its Motion for Class Certification.  ECF No. 50 at 9.  Defendant seeks to exclude Felix's Report and testimony.  ECF No. 58 at 2.

*A.    Qualifications*

Here, Felix obtained his Bachelor's Degree in Business from the University of Colorado Denver in 1986 and worked in automotive management since that time.  ECF Nos. 50-7 at 2; 73-4 at 7.  Between 1999 and August 2022, when he retired, Felix worked as "a moderator and consultant with NCM Associating, Inc."[6]  ECF No. 50-7 at 2.  While he worked at NCM, Felix "ran 20 Groups, which are groups of 20 dealerships from around the country . . . that meet at regular intervals to discuss industry trends and best practices for operating efficient, profitable dealerships."  *Id.*  Felix's work at NCM also involved reviewing dealership financial performance, which includes "volume, sales amounts, gross profit, expenses[,] and net profit."  *Id.*  NCM also "produces over 35 pages of detailed financial comparisons monthly[,]" which "reflects current market and dealership performance."  *Id.*  While Felix ran the 20 groups, he worked with over 300 dealerships in total.  *Id.*  In addition, Felix met twice a year with other consultants and moderators at NCM "to discuss industry trends and best practices[.]"  *Id.*  In total, "[a]t any given time, NCM moderators and consultants are working with 2,600 to more than 3,300 dealerships throughout the United States."  *Id.*

Felix intends to provide the following opinions: (1) "because of Internet advertising and shopping, 'comparison tools' available to consumers when shopping for used autos, and state-of-the-art, sophisticated pricing tools or software, vehicles are priced to market

---

[6] NCM Associates, Inc. will be hereafter referred to as "NCM."

and used car dealers do not deviate down from the advertised cash price[,]" (2) the PSA applied by Mitchell "is directly contrary to reality in the used auto market[,]" (3) used vehicles may sell below the listed price for various reasons, (4) used vehicles may sell above the listed price for various reasons, (5) "in the used car industry, the listed price reflects the market price" and (6) "COVID-19 impacted the price of vehicles, but not pricing." *Id.* at 3, 5–9.

The Court finds that Felix is qualified to opine on the above topics. He has the knowledge and experience to discuss the used car market generally as well as changes to it brought by internet advertising, shopping, and online comparison tools and general market trends in the used car industry. General market trends include the fact that used vehicles are allegedly sold both above and below their listed price and reasons why that happens. In addition, he is qualified to discuss the impact of COVID-19 on the used vehicle market.

However, the Court is concerned whether Felix is qualified to testify about Mitchell's valuation process of methodology, including whether the PSA applied by Mitchell comports with standard practices in the used vehicle market. Felix opines in his Report that the PSA as applied by Mitchell "is directly contrary to reality in the used auto market" and that:

> Progressive is essentially using the same method and same sources to value vehicles as car dealers use to price vehicles. Mitchell and Progressive assume that car dealers go through that process, identify a market price, and then advertise the vehicles above that market price on the off chance of finding . . . someone willing to pay more than the market price but willing (and expecting) to negotiate down. For the reasons I already explained, that just is not true.

ECF No. 50-7 at 5–6. However, during his deposition Felix testified as follows:

Q:    Have you ever used the WorkCenter Total Loss software?

A:    No, I haven't.

Q:    Have you ever used any other Mitchell tool?

A:    No, I haven't.

ECF No. 73-4 at 6.

Q:    Okay.  Have you reviewed any of the data underlying Mitchell's calculation of the projected sold adjustments?

A:    No, I haven't.

*Id.* at 13.

Q:    Did you do any analysis of Mitchell?

A:    No.

*Id.* at 14.

Q:    All right. Let's look at page 4 of your Freeman report . . . . It says: My understanding is that if the condition had been lower or higher than good, Mitchell would have done a downward or upward adjustment.  Did that understanding come from counsel?

A:    In discussion as far as the way the Mitchell reports operated, it would have been a discussion that we had.

Q:    Okay.  Did you do anything to verify that that – that's how Mitchell works?

A:    No, I did not.

*Id.* at 20.

Q:    Okay.  So you think Mitchell is reliable except for the projected sold adjustment?

A:    I don't know.  You're asking me . . . for an opinion on Mitchell when I – Mitchell is not – is nowhere in the

11

> retail car business, so I had no knowledge of Mitchell
> until I saw ther reports.  So I think it's hard to form an
> opinion of their reliability based on that I've never
> experienced – never had any exposure to them.

*Id*. at 32.  Given the above testimony, Plaintiff has not demonstrated by a preponderance

of the evidence that Felix has the requisite knowledge or experience to opine about

Mitchell's valuation process or methodology.  However, the Court finds, as other courts

have noted, that Felix is qualified to testify that the concept of a PSA is inconsistent with

current practices in the used vehicle market.

       B.     *Reliability*

       Here, Felix's expertise is not based on science, but on knowledge, skill, and

training.  As discussed above, Felix has extensive experience in the used vehicle market

dating back to 1986.   ECF No. 50-7 at 2. Felix's experience includes working as a

moderator and consultant for 23 years, during which time he worked with more than 300

dealerships.  *Id*.  Felix also ran 20 groups of dealerships across the United States and

met with the dealerships on a regular basis "to discuss industry trends and best practices

for operating efficient, profitable dealerships."  *Id*.  During his deposition, Felix described

his role as a moderator and consultant as follows:

> And then when we get to the meeting, we are responsible for
> actually running the meeting, keeping everything on track,
> being the expert in the composite as far as to what's
> happening financially in the market.  Asking probing questions
> . . . [to] the person that's doing the best on the left-hand side
> of the page, getting him to share his best practices of what
> he's doing, whether it's used cars, new cars, F&I, fixed
> operations and then challenging the person on the right-hand
> side of the page that has a lot of opportunity to improve their
> performance when they go back.

ECF No. 73-4 at 8.  Further, Felix stated in his Report that a recurring topic discussed in

the 20 groups he ran included changes to the used vehicle industry brought about by the Internet. ECF No. 50-7 at 2. During his deposition, he stated that NCM produced composite comparisons ranking dealerships based on financial statements provided by 20 group dealerships. ECF No. 73-4 at 7.

Given Felix's extensive experience in the used car business, the Court finds that some of Felix's opinions—internet advertising and shopping and online comparison tools affected the pricing of used vehicles to the extent that they "are priced to market and used car dealers do not deviate down from the advertised cash price[,]" used vehicles may sell above or below the listed price for various reasons, "the listed price reflects the market price[,]" and "COVID-19 impacted the price of vehicles, but not pricing"—"reflect[] a reliable application of the principles and methods to the facts of the case." However, opining that the PSA as applied by Mitchell "is directly contrary to reality in the auto car market[,]" ECF No. 50-7 at 5, does not "reflect[] a reliable application of the principles and methods to the facts of the case" because, as noted above, Felix did not analyze "data underlying Mitchell's calculation of the projected sold adjustments" nor "had any exposure to them[,]" ECF No. 73-4 at 13, 32.

C.    *Relevance*

Here, Felix's Report and testimony is relevant to the extent that it will assist the trier of fact in understanding the pricing and selling of used vehicles in the used auto market and how such pricing was affected by the Internet, including internet advertising and comparison tools. In his Report, Felix also provides reasons why a used vehicle may be sold above or below its listed price, including but not limited to financing through the dealership, incentivizing use of service department, and special discounts. ECF No. 50-

7 at 8–9.  Moreover, in Felix's opinion, "COVID-19 impacted the price of vehicles, but not pricing."  *Id.* at 10.  Such testimony allows the trier of fact to compare industry practices with what happened in the present case.

In summary, the Court grants the Motion to Exclude in part.  Plaintiff is prohibited from eliciting testimony from Felix regarding Mitchell's valuation process or methodology. Plaintiff is further prohibited from relying on Felix's Report or testimony related to Mitchell's valuation process in any future filings.  The Motion is denied in all other respects.

**Todd Caputo**

Plaintiff offers the Report and testimony of expert witness Caputo in support of its Motion for Class Certification.  ECF No. 50 at 10–11.  Defendant seeks to exclude Caputo's Report and testimony.  ECF No. 58 at 2.

*A.    Qualifications*

Here, Caputo has "been in the retail automotive industry for [his] entire professional career."  ECF No. 50-8 at 6.  In 1994, Caputo started working as the General Manager of Sun Chevrolet.  *Id.*  In 2004 and onwards, Caputo "purchased three new-car dealerships and converted them [into] high-volume independent used car dealerships under the brand 'Used Car King.'"  *Id.*  Later, Caputo worked "as the Director of Delivery Center Operations for EchoPark Automotive . . . until May 2020."  *Id.*  As Director, Caputo managed locations in both Greenville and Charleston that sold used vehicles.  *Id.*  As of September 1, 2022, the date on which he executed his Report, Caputo served as a consultant for dealerships "across the United States, including a Chevrolet dealer in Charlotte, North Carolina[.]"  *Id.* at 6–7.  As to his knowledge, Caputo asserts the following:

> During my decades in the used-car business, I have gained expertise in automotive retail, wholesale variable operations, and in-dealership fixed operations.  I specialize in acquiring used vehicle inventory, reconditioning those vehicles, new and used vehicle e-commerce, and digital and traditional marketing.

*Id.* at 7.

Under Rule 702, Plaintiff bears the burden of demonstrating that Caputo's background qualifies him to opine about the subject matter of his testimony.  *Id.*  Caputo intends to provide the following opinions: (1) internet technologies have changed "[t]he processes and strategies involved in the pricing and sale of used vehicles[,]" (2) vehicles are generally sold for their listed price, (3) used vehicles may sell below the listed price for reasons unrelated to the value of the vehicle, and (4) the PSA applied in the Mitchell Market Valuation Report "is not based on anything real in the used auto market industry." *Id.* at 1, 5.

The Court finds that Caputo is qualified to opine on the above topics.  He has the knowledge and experience to discuss changes to the used vehicle market brought by internet technologies, general market trends related to the sale of used vehicles, including the fact that they are allegedly sold for their listed price and reasons why they may sell below the listed price.  In addition, Caputo represents in his Report that he currently serves as a consultant for multiple dealerships across the country.

However, the Court is concerned whether Caputo is qualified to testify about Mitchell's valuation process or methodology.  During his deposition, Caputo testified as follows:

[redacted]

ECF No. 89-3 at 6–7.  Given the above testimony, Plaintiff has not demonstrated by a

preponderance of the evidence that Caputo has the requisite knowledge or experience to opine about Mitchell's valuation process or methodology because Caputo admits that had not even "heard of Mitchell in the context of vehicle valuations[.]"  *Id.*; *see also Costello v. Mountain Laurel Assurance Co.*, C.A. No. 2:22-CV-25, 2024 WL 239849, at *11 (E.D. Tenn. Jan. 22, 2024) (stating that "Felix has admitted that he does not have sufficient knowledge regarding Mitchell's process and underlying data to form an opinion as to the methodology's reliability.  Accordingly . . . the Court specifically finds that Felix is prohibited from providing testimony directly addressing Mitchell's methodology").[7]  However, similar to Felix, Caputo is qualified to testify that the concept of a PSA is inconsistent with current practices in the used vehicle market.

   *B.    Reliability*

   Here, Caputo's expertise is not based on science, but on knowledge, skill, and training.  As discussed above, Caputo has decades of experience in the used-car business.  ECF No. 50-8 at 6–7.  As of September 1, 2022, Caputo worked as a consultant for multiple dealerships across the United States.  *Id.*  During Caputo's deposition, the following exchange occurred:

> Q:    Okay.  And what kind of consulting do you do?
>
> A:    I consult for car dealers, and I also consult for businesses that are in automotive retail, so software vendors.  Anything to do with automotive, I will consult for those companies.  And I consult for new car dealers.
>
> Q:    Okay.  Do you have a specific area of focus with respect to dealership consulting that you help with?

---

[7] The Court notes that Caputo and Felix are similar in that their opinions are based on knowledge, skill, and training and neither expert is directly familiar with Mitchell's valuation or methodology.

A:     Pre-owned vehicles, pre-owned acquisition of vehicles, pre-owned merchandising, reconditioning, pricing of inventory, operations, e-commerce.

ECF No. 73-3 at 8.  Caputo further testified that he "talk[s] to car dealers all over the country" and "attend[s] conferences."  *Id.* at 12.  While Caputo's Report states that he only reviewed Plaintiff's Complaint and Plaintiff's Mitchell Valuation Report, ECF No. 50-8 at 7, during his deposition he stated that he studies the used-car industry, which includes looking at market data and reading "industry publications every single day" including J.D. Power, Black Book, and Kelly Blue Book, ECF No. 73-3 at 12.  Given Caputo's extensive experience in the used car business, the Court finds that some of Caputo's opinions—internet technologies have changed "[t]he processes and strategies involved in the pricing and sale of used vehicles[,]" vehicles are generally sold for their listed price, and used vehicles may sell below the listed price for reasons unrelated to the value of the vehicle—"reflect[] a reliable application of the principles and methods to the facts of the case."  However, opining that the PSA applied in the Mitchell Market Valuation Report "is not based on anything real in the used auto market industry[,]"  ECF No. 50-8 at 5, does not "reflect[] a reliable application of the principles and methods to the facts of the case" because, as noted above, Caputo had "not heard of Mitchell in the context of vehicle valuations" prior to his involvement in the present case, ECF No. 73-3 at 7.

C.     *Relevance*

Here, Caputo's Report and testimony is relevant to the extent that it will assist the trier of fact in understanding past practices, such as negotiation, when listing a used vehicle above market price and how internet technologies affected modern pricing and selling practices.  In his Report, Caputo also provides reasons why a used vehicle may

17

not be sold at its listed price, despite a general practice of used vehicles being sold at the listed price, including discounts for friends and family "or the profit portion of the market price was realized but the deal was structured in a way that makes it appear to have been sold for less than market price." ECF No. 50-8 at 2. Such testimony allows the trier of fact to compare industry practices with what happened in the present case.

In summary, the Court grants the Motion to Exclude in part. Plaintiff is prohibited from eliciting testimony from Caputo regarding Mitchell's valuation process or methodology. Plaintiff is further prohibited from relying on Caputo's Report or testimony related to Mitchell's valuation process in any future filings. The Motion is denied in all other respects.

**Jeffrey Martin**

Plaintiff offers the Report and testimony of expert witness Martin in support of its Motion for Class Certification. ECF No. 50 at 15–16. Defendant seeks to exclude Martin's Report and testimony. ECF No. 59 at 2.

*A.   Qualifications*

Here, Martin has "a Bachelor's Degree in Mathematics and Economics from Vanderbilt University and a Master's [D]egree in Economics from the University of Chicago." ECF No. 50-11 at 2. Martin works as a consultant on multiple issues including statistical issues, actuarial issues, and on political campaigns. *Id.* Further, Martin's academic research "involve[s] the use of computers and statistical procedures to analyze data." *Id.* Martin also provided testimony in other cases and is qualified as an expert witness on statistical issues in several state and federal courts. *Id.*

Although Martin acknowledges that he has "not evaluated Progressive's

methodology or data," he asserts that his "Report is unrelated to and does not depend on anything about Progressive's methodology." *Id.* at 3. In this Report, Martin expresses opinions based on List Data and Sold Data related to used vehicle sales for 2018–2021 in Ohio, Texas, and Virginia. *Id.* at 4. The Court finds that Martin is qualified as an expert statistician.

      *B.    Reliability*

In contrast to Caputo and Felix, Martin's opinions are based on methodology. In his Report, Martin explains that he obtained List Data and Sold Data from two different companies and identified matches based on "a specific vehicle VIN number." *Id.* at 3–4. Martin received the List Data from MarketCheck, which "crawls the Internet and pulls auto advertisements directly from the websites of auto dealerships throughout the United States" and received the Sold Data from Cross-Sell, which obtains data "from the Department of Motor Vehicles for the respective states for all vehicles reported as sold in the state." *Id.* at 4. Based on both the List Data and Sold Data, Martin "identif[ied] [a] S/L Ratio, expressed as both a median and a mean, for sales in a given year . . . including based on a variety of different control factors, including vehicle year/make/model or price points[.]" *Id.* In calculating the median and mean S/L Ratio, Martin identified outlier parameters. *Id.* at 4–5. For each year between 2018 and 2021, Martin identified total matches in the aggregate and by each state in question as well as the median and mean S/L Ratio both prior to and after applying outlier parameters. *Id.* at 6–13.

While both parties argue about the validity of the Sold Data as provided by Cross-Sell, ECF Nos. 59-1 at 5–6; 80 at 16–17, Martin avers in his Report that the Sold Data "is used for research and analysis and projects in a variety of industries, including

universities, insurance companies, appraisal companies, and the auto industry[,]" ECF No. 50-11 at 4. The parties dispute whether the Sold Data includes outside costs and fees, but such arguments are best reserved for trial and do not relate to whether Martin's opinions are reliable under *Daubert*. Accordingly, the Court finds that Martin's opinions "reflect[] a reliable application of the principles and methods to the facts of the case."

   C.    *Relevant*

Here, Martin's Report and testimony is relevant to the extent that it will assist the trier of fact in understanding Plaintiff's theory of the case that, in the used vehicle industry, it is common practice to sell used vehicles at the listed price. Moreover, Martin's data analysis is consistent with the opinions expressed by both Caputo and Felix. Therefore, the Court denies Defendant's Motion to Exclude the Report and Testimony of Jeffrey Martin.

   **Jason Merritt**

Plaintiff offers the Report and testimony of expert witness Merritt in support of its Motion for Class Certification. ECF No. 50 at 11. Defendant seeks to exclude Merritt's Report and testimony. ECF No. 60 at 2.

   A.    *Qualifications*

Here, Merritt is the owner of East Coast Auto Appraisers, LLC and Merritt's Automotive, LLC and works as a certified appraiser of vehicles, including total losses. ECF No. 60-6 at 2. Merritt is certified through the Bureau of Certified Auto Appraisers. *Id.* As of the date of his Report, August 31, 2022, Merritt "appraised over a thousand vehicles to determine their fair market, or actual cash, value." *Id.* Not only has Merritt appraised vehicles "to determine the value of a totaled vehicle" but he has also "appraised

vehicles daily for the purpose of determining the fair market value." *Id.* In addition, Merritt "performed hundreds of appraisals for the Timbrook Automotive Organization, which includes franchise dealerships for Chevrolet, Buick, GMC, Kia, Nissan, Ford, Chrysler, Dodge, Jeep, and Honda." *Id.* Prior to working as an appraiser, Merritt worked as law enforcement for 28 years in the Maryland State Police. *Id.* During such time, he "received advanced training in accident investigations" and "acquir[ed] and maintain[ed] the unit's vehicles." *Id.*

Merritt intends to provide the following opinions: (1) "Mitchell's methodology is consistent with the comparable methodology routinely applied by appraisers and is capable of producing a correct or sound appraisal of actual cash value[,]" and (2) "Mitchell deviated from the comp methodology . . . by applying downward adjustments to the Internet prices of the specific comparable vehicles advertised for sale." *Id.* at 5.

Like other courts, the undersigned finds that Merritt is qualified to opine on the above topics. He has the knowledge and experience to testify about appraisals in the used vehicle market, the application of comp methodology, and the extent to which PSAs are applied in the used vehicle industry. Further, Merritt is qualified to testify that Mitchell deviated from comp methodology by applying PSAs.

B.    *Reliability*

Merritt's opinions are based on knowledge, skill, and training. In his Report, Merritt discusses appraisal methodologies, including comp methodology used to determine the ACV of used vehicles. ECF No. 60-6 at 3. As Merritt explains, comp methodology generally involves determining ACV by finding vehicles for sale within a specific geographic area through internet advertisements. *Id.* He further explains that "[o]nce the

comps are chosen, differences in observed and verifiable features . . . between the loss vehicle and the comps are documented[,]" and "[d]ifferences between vehicles in observed and documented characteristics result in price adjustments from the list price of the comparable vehicles." *Id.* at 3–4. Merritt opines that "Mitchell largely followed this methodology" but "deviated from the comp methodology . . . by applying downward adjustments to the Internet prices of the specific comparable vehicles advertised for sale." *Id.* at 4–5. Merritt believes that absent the application of the PSA, Mitchell's valuation and methodology "provide[s] a sound opinion on the actual cash value of Plaintiff's vehicle[.]" *Id.* at 6. Moreover, Merritt opines that a sound appraisal may be reached using Mitchell's valuation and methodology if:

> [Y]ou would line-item out each Projected Sold Adjustment applied to a comp, recalculate the "Adjusted Price" of each comparable vehicle to which a Projected Sold Adjustment was applied, and then recalculate the average of the Adjusted Prices to arrive at a revised "Base Value." From there, the Market Value can be recalculated using that revised Base Value and the adjustments for condition, prior damage, aftermarket parts, or refurbishment already determined by Mitchell.

*Id.* at 7.

Rule 702 permits an expert witness to rely on his experience in formulating his or her opinion or opinions. *See* Fed. R. Evid. 702 Advisory Committee's Note to 2000 Amendment (stating that "[n]othing in this amendment is intended to suggest that experience alone—or experience in conjunction with other knowledge, skill, training, or education—may not provide a sufficient foundation for expert testimony"). Given that Merritt's opinions are based on his appraisal experience, the Court finds that Merritt's opinions that "Mitchell's methodology is consistent with the comparable methodology

22

routinely applied by appraisers and is capable of producing a correct or sound appraisal of actual cash value[,]" and "Mitchell deviated from the comp methodology . . . by applying downward adjustments to the Internet prices of the specific comparable vehicles advertised for sale[,]"  ECF No. 60-6 at 5, "reflect[] a reliable application of the principles and methods to the facts of the case."  While Merritt does not know how Mitchell's PSA is calculated or what data it relies on, ECF No. 73-11 at 6, such acknowledgment does not render unreliable his opinion that removal of the PSA from Mitchell's methodology would result in an accurate ACV.  *See Volino v. Cas. Ins. Co.*, C.A. Nos. 21 Civ. 6243 (LGS); 22 Civ. 1714 (LGS), 2023 WL 2532836, at *4 (S.D.N.Y. Mar. 16, 2023) (stating that "[b]ecause Merritt opined that an appraiser would not apply the PSA as Progressive does but would apply all of the other adjustments in the 'comp' methodology, Merritt's opinion that a proper appraisal could consist of Progressive's methodology minus the PSA is reliable and helpful"); *see also Clippinger v. State Farm Mut. Auto. Ins. Co.*, C.A. No. 2:20-cv-02482-TLP-cgc, 2023 WL 7213796, at *6 (W.D. Tenn. Aug. 25, 2023) (stating that "Merritt's personal knowledge and experience as an appraiser can serve as the basis of his reliable testimony") (citing *Kumho Tire Co.*, 526 U.S. at 150).

    *C.    Relevance*

    Here, Merritt's Report and testimony is relevant to the extent that it will assist the trier of fact in understanding the appraisal of used vehicles, including current practices in the industry, comp methodology and the application of the PSA.  Accordingly, the Court denies Defendant's Motion to Exclude the Report and Testimony of Jason Merritt.

    *Jeremiah Kuntz*

    Plaintiff offers a Declaration from Kuntz in support of Martin as an expert witness

in her Motion for Class Certification. *See* ECF No. 80-3. Defendant seeks to exclude the Declaration, but Plaintiff clarifies that "Kuntz is not providing expert testimony." ECF Nos. 100 at 4; 106 at 11. As a result, Rule 702 is inapplicable to the admissibility of the Declaration. *See Romeo*, 2020 WL 1430468, at *2. Thus, as discussed above with Phillips' Declaration, the Court will construe Defendant's Motion as a Motion to Strike under Federal Rule of Civil Procedure 12(f).

Mr. Kuntz indicates in his declaration that he served as the Director of the Titling and Registration Division at the Texas Department of Motor Vehicles ("DMV") for six years, with a total of 18 years of experience in policy and administration related to registration and titling of vehicles in that state. ECF No. 80-3 at 2. He then explains that the sales price information that is reported to the Texas DMV (and thereby available for purchase by third-party vendors such as Cross-Sell, LLC) is simply the selling price of the vehicle and does not include dealer fees, "doc fees," regulatory fees, state taxes, and add-on products such as extended warranties. *Id.* at 8.

While not strictly necessary to the question of class certification, Kuntz's' Declaration is admissible in support of Martin as an expert witness in Plaintiff's Motion for Class Certification.[8] In addressing whether a declaration is admissible for the purpose of class certification, "personal knowledge is important to the requisite analysis." *Romeo*, 2020 WL 1430468, at *5. Kuntz avers that "I am over the age of eighteen and provide

---

[8] Defendant also objects to the Kuntz Declaration because it is unsworn and untimely. The Court notes that Plaintiff subsequently submitted a sworn version of the Declaration. Likewise, while offered in support of Martin, the Kuntz Declaration is more specifically offered in response to the declaration of John Scheuren which is utilized by Defendant is support of its expert, Dr. Jonatan Walker.

this declaration and report freely, voluntarily, and based on personal knowledge." ECF No. 80-3 at 2. Accordingly, Defendant's Motion to Exclude the Unsworn Declaration of Jeremiah Kuntz is denied.

## **CLASS CERTIFICATION**

### **_Applicable Law_**

#### **Class Certification**

In order for a class to be certified, Federal Rule of Civil Procedure 23(a) requires a district court to make the following determinations:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). "A party seeking class certification must affirmatively demonstrate his compliance with the Rule, and must do so with evidentiary proof." *In re Zetia (Ezetimibe) Antitrust Litig.*, 7 F.4th 227, 234 (4th Cir. 2021) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) and *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (internal quotation marks omitted)).

In addition to satisfying the requirements outlined in Rule 23(a), "the class action must fall within one of the three categories enumerated in Rule 23(b)[.]" *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 423 (4th Cir. 2003). The categories are as follows: "(1) individual actions would risk inconsistent adjudications with respect to individual class members or adjudications dispositive of the interests of non-parties; (2) class-wide

injunctive [or] declaratory relief is sought and appropriate; or (3) questions of fact or law common to the class predominate over any questions affecting individual members." *Martin v. JTH Tax, Inc.*, C.A. No. 9:10-cv-03016-DCN, 2013 WL 442425, at *4 (D.S.C. Feb. 5, 2013) (citing Fed. R. Civ. P. 23(b)).  "In a class action brought under Rule 23(b)(3), the 'commonality' requirement of Rule 23(a)(2) is 'subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class predominate over' other questions."  *Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 146 n.4 (4th Cir. 2001) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 609 (1997)).  "[I]t is the plaintiff who bears the burden of showing that the class *does comply* with Rule 23." *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 321 (4th Cir. 2006) (emphasis in original).

In addition, the United States Court of Appeals for the Fourth Circuit has "repeatedly recognized that Rule 23 contains an implicit threshold requirement that the members of a proposed class be 'readily identifiable.'"  *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014) (quoting *Hammond v. Powell*, 462 F.2d 1053, 1055 (4th Cir. 1972)); *see also Roman v. ESB, Inc.*, 550 F.2d 1343, 1348 (4th Cir. 1976) ("Although not specifically mentioned in the rule, the definition of the class is an essential prerequisite to maintaining a class action.").

"In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met."  *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974) (quoting *Miller v. Mackey Int'l*, 452 F.2d 424, 427 (5th Cir. 1971)). "Questions regarding the certification of a class action are left to the sound discretion of

the district court and any such decision by the district court will only be reversed upon a showing of abuse of that discretion." *Stott v. Haworth*, 916 F.2d 134, 139 (4th Cir. 1990) (citing *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986)).

### ***Discussion***

Plaintiff moves for class certification under Federal Rules of Civil Procedure 23(a) and 23(b)(3).  ECF No. 50.  Defendant opposes the Motion on the grounds that Plaintiff fails to satisfy the commonality, predominance, and ascertainability requirements and because Plaintiff is ill-suited to serve as the class representative.  ECF No. 61.  As explained in more detail below, the Court grants Plaintiff's Motion for Class Certification.[9]

### Rule 23(a)(1): Numerosity

Rule 23(a)(1) requires that a class be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 26(a)(1).  The Fourth Circuit has held that "[n]o specified number is needed to maintain a class action," and "application of the rule is to be considered in light of the particular circumstances of the case."  *Brady v. Thurston Motor Lines*, 726 F.2d 136, 145 (4th Cir. 1984) (quoting *Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n*, 375 F.2d 648, 653 (4th Cir. 1967) (internal quotation marks omitted)).  Plaintiff contends that the class is sufficiently numerous, which Defendant does not seem to challenge.  The Court finds that Plaintiff has established at this stage of the proceedings that the class is sufficiently numerous such that joinder is impractical.  *See*

---

[9] Many of the parties' arguments are repeated and referenced throughout their briefing.  To the extent this Court does not address each argument under each heading, the analysis is equally applicable throughout.

William B. Rubenstein, 1 *Newberg & Rubenstein on Class Actions*, § 3:11 (6th ed. 2022)

("No specific number alone is determinative of whether numerosity is present, but joinder

is generally deemed practicable in classes with fewer than 20 members and impracticable

in classes with more than 40 members.").

### Rule 23(a)(2): Commonality & Rule 23(b)(3): Predominance

Rule 23(a)(2) requires that "there are questions of law or fact common to the class."

Fed. R. Civ. P. 23(a)(2). "A common question is one that can be resolved for each class

member in a single hearing . . . ." *Thorn*, 445 F.3d at 319. "Generally, courts give this

commonality requirement a permissive application since the threshold for commonality is

'not high' and 'only requires that some questions of law or fact be shared by the putative

class members, and not all questions raised be common.'" *DeGidio v. Crazy Horse*

*Saloon & Rest., Inc.*, C.A. No. 4:13-cv-02136-BHH, 2017 WL 5624310, at *11 (D.S.C.

Jan. 26, 2017) (citing *Paulino v. Dollar Gen. Corp.*, 2014 WL 1875266, at *4 (N.D. W. Va.

Feb. 24, 2014) and quoting *Brown v. Nucor Corp.*, 576 F.3d 149, 153 (4th Cir. 2009) and

*Kohl v. Ass'n of Trial Laws. of Am.*, 183 F.R.D. 475, 484 (D. Md. 1998)).

Rule 23(b)(3) permits class actions if

> the court finds that the questions of law or fact common to
> class members predominate over any questions affecting only
> individual members, and that a class action is superior to other
> available methods for fairly and efficiently adjudicating the
> controversy.

Fed. R. Civ. P. 23(b)(3). As explained above, in a class action brought under Rule

23(b)(3), such as this one, "the 'commonality' requirement of Rule 23(a)(2) is 'subsumed

under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions

common to the class predominate over' other questions." *Lienhart*, 255 F.3d at 146 n.4

(quoting *Amchem*, 521 U.S. at 609). "The predominance inquiry 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Id.* at 147 (quoting *Amchem*, 521 U.S. at 623).

Plaintiff asserts that common issues predominate in this action because the question relevant to each claim is whether Defendant's application of the PSA constitutes a breach of the policy. Plaintiff contends that the policies contained the same language and resolution of the claim will turn on the interpretation of the policy language.

Defendant argues that the common question presented by Plaintiff does not generate a common answer or predominate over inherent individual issues. It contends that the Court will need to resolve whether the application of the PSA caused Defendant to pay less than the ACV for each class member. Defendant further asserts that no common question predominates because two of the three elements for breach of contract must be determined on an individual basis. Specifically, Defendant argues that whether there was a breach and resulting damages as well as whether each class member has Article III standing will need to be decided for each class member.

Upon review, the undersigned agrees with the other courts throughout the country that have granted class certification. The question common to the proposed class is whether Defendant's use of PSAs breached its duty to pay the ACV of the totaled vehicle. Here, the proposed class members all had the ACV of their vehicle calculated, in part, through the application of PSAs. The common question is whether this action resulted in a breach of contract; the answer to this question should be the same across the class. Accordingly, the Court finds the commonality requirement has been met.

Defendant further argues that each member of the potential class will need to demonstrate that they received less than the ACV of their vehicles, which will require a complicated valuation of each individual vehicle and the comparable vehicles used in the initial calculation.  However, as noted by other courts, that argument misstates the issue. *See Drummond v. Progressive Specialty Ins. Co.*, No. CV 21-4479, 2023 WL 5181596, at *10 (E.D. Pa. Aug. 11, 2023).  Here, the question is whether the PSA should be applied at all.[10]

Framing the issue as whether the application of PSAs breached the potential class member's policies also resolves Defendant's arguments regarding standing and resulting damages from the alleged breach.  Defendant contends that these are individualized

---

[10] The Court also finds that this action is distinguishable from the cases relied upon by Defendant to argue against a finding of commonality and predominance.  In *Lara*, the Ninth Circuit upheld a denial of class certification where the plaintiffs contested a vehicle condition adjustment that could affect valuation either positively or negatively.  *See Lara v. First Nat'l Ins. Co. of Am.,* 25 F.4th 1134, 1136 (9th Cir. 2022).  That court determined that finding whether each potential class member had been harmed would require an onerous, individualized determination. Here, common proof can be used because PSAs only operate to devalue a vehicle and Plaintiff claims that the application of PSAs leads to an inaccurate finding of ACV.  Likewise, the Western District of Washington denied class certification where the plaintiffs acknowledged that they never intended to prove that they received less than ACV.  *See Ngethpharat v. State Farm Mut. Auto. Ins. Co.*, No. C20-454, 2022 WL 1404526, *2 (W.D. Wash. May 4, 2022).  Such is not the case here.

In *Curtis v. Progressive Northern Ins. Co.*, 2020 WL 2461482 (W.D. Ok. May 12, 2020), class certification was denied because the proposed class representatives' valuation methodologies could have resulted in lower valuations for other class members. Here, whether PSAs violated the policies of the proposed class will be a common question with a common answer.  Finally, class certification was denied in *Richardson v. Progressive Am. Ins. Co.*, 2022 WL 154426, at *5 (M.D. Fla. Jan. 18, 2022), where the plaintiffs failed to put forward a theory as to how a correct adjustment could be determined on a class-wide basis.  Again, such is not the case here.  The Court therefore finds these cases are distinguishable, as well as nonbinding, and do not bear on the Court's decision regarding class certification.

questions.   However, the Court finds that the common questions of law and fact predominate this litigation.   Here, the proposed class suffered the same alleged injury— the improper valuation of their totaled vehicles through the application of PSAs.   With respect to resulting damages and Article III standing,[11] the alleged injury is concrete, particularized, and actual.   *See Lujan*, 504 U.S. at 560 (holding that injury in fact requires "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical" (internal quotation marks and citations omitted)).   The evaluation of these issues does not require individualized litigation as argued by Defendant.[12]   The Court further finds that the evidence common to the class will be presented to establish whether the use of PSAs violates the policies of the proposed class members.   Accordingly, Plaintiff has met the commonality and predominance requirements.

### Ascertainability

The Fourth Circuit has held that a class cannot be certified if the class members are not identifiable or ascertainable, stating ". . . Rule 23 contains an implicit threshold requirement that the members of a proposed class be 'readily identifiable.'" *EQT Prod. Co.*, 764 F.3d at 358 (quoting *Hammond*, 462 F.2d at 1055); *see also Solo v. Bausch &*

---

[11] The Court further addresses Defendant's arguments regarding Plaintiff's standing to bring this lawsuit, *infra*.

[12] The Court further finds that, while Plaintiff's damages model is contested and Defendant contends that a damages calculation will be more complex than removing PSAs from the calculation of ACV, this issue does not change the fact that common issues predominate the litigation. *See Volino v. Progressive Cas. Ins. Co.,* Nos. 21 Civ. 6243 & 22 Civ. 1714, 2023 WL 2532836, at *11 (S.D.N.Y. Mar. 16, 2023) ("Even if Plaintiffs' methodology does not capture every nuance of Progressive's formula, that would not invalidate the model for purposes of class certification.").   Accordingly, the Court finds that the predominance requirement has been met.

*Lomb Inc.*, No. 2:06-CV-02716-DCN, 2009 WL 4287706, at *4 (D.S.C. Sept. 25, 2009) ("[A]s a preliminary matter, the court must consider the definition of the class when determining the appropriateness of class certification.") (citing *Kirkman v. North Carolina R. Co.*, 220 F.R.D. 49, 53 (M.D.N.C. 2004)).  "If class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate." *EQT Prod. Co.*, 764 F.3d at 358 (quoting *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 593 (3d Cir. 2012)).   Moreover, courts have further expounded that a "plaintiff cannot merely identify a mass of data which could aid the process of identifying class members[,] . . . the [p]laintiff must also provide an efficient method of using this information." *Spotswood v. Hertz Corp.*, No. RDB-16-1200, 2019 WL 498822, at *6 (D. Md. Feb. 7, 2019).  However, "the plaintiff[] need not be able to identify every class member at the time of certification."  *EQT Prod. Co.*, 764 F.3d at 358.

Defendant argues that the potential class members are not ascertainable due to questions of standing and the necessary file-by-file inquiry into whether the value of the comparable vehicles were reduced by the PSA and whether the potential class member secured a larger settlement through an appraisal or negotiation.  ECF No. 61 at 34–37. Defendant contends that gathering the necessary information to ascertain the class would be overly burdensome because each file would have to be individually reviewed.

The Court agrees with the *Drummond* court that "the class is ascertainable because it is 'defined with reference to objective criteria' and its potential members can be identified using [Defendant's] records." *Drummond*, 2023 WL 5181596, at *7 (quoting *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015)).  Moreover, Defendant has not

sufficiently demonstrated that it will be overly burdensome to ascertain the class. *See In re Marriott Int'l, Inc.,* 341 F.R.D. 128, 146 (D. Md. 2022) ("Identifying class members will no doubt be time consuming, but that fact does not defeat ascertainability.")  Accordingly, the Court finds that Plaintiff has met the ascertainability requirement.[13]

### Rule 23(b)(3): Superiority of Class Action

"In addition to the predominance requirement, Rule 23(b)(3) requires that the Court find that 'a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.'"  *Robert Elliott Trucking, Inc. v. Caterpillar, Inc.*, C.A. No. 9:11-cv-00753-RMG, 2012 WL 2918700, at *9 (D.S.C. Mar. 21, 2012) (quoting Fed. R. Civ. P. 23(b)(3)).   In determining whether superiority is met, the district court should consider:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3); *see Soutter v. Equifax Info. Servs., LLC*, 307 F.R.D. 183, 217–18 (E.D. Va. 2015).

---

[13] With respect to Defendant's negotiation argument, the Court again turns to the ultimate issue at hand: the application of PSAs.  There is evidence in the record that none of the negotiations appear to have resulted in Defendant declining to apply PSAs. *See* ECF No. 84-1 at 17–18.  Accordingly, Defendant's argument is unpersuasive.

Defendant contends that superiority has not been established because class certification would lead to thousands of mini trials. ECF No. 61 at 22, n.6. Defendant also argues that there were other options available to policyholders dissatisfied with Defendant's valuation of their vehicles. *Id.*

The Court finds that Plaintiff has satisfied the superiority requirement in this case. With respect to Defendant's argument that other options were available to policyholders, the Court agrees with the *Drummond* court that the facts, as presented here, support a finding of superiority. *See Drummond,* 2023 WL 5181596, at *12. In addition, there is no evidence before the Court that there is any other case pending against Defendant regarding the question presented here in this District. Because Plaintiff and the potential class members are policyholders in South Carolina, it is reasonable for the litigation of these claims to be concentrated in this forum. Moreover, this case involves common answers to common questions, which will apply to all class members, making class action an efficient form of adjudication. There is nothing to indicate that individual class members have any significant interest in litigating their claims separately. Indeed, the costs of prosecuting each class member's claims individually would likely exceed each member's damages. Because the recoveries of each individual class member will be relatively small, a class action is superior to other methods of adjudication. Therefore, the Court finds that, based on the facts of this case, a class action is superior to individual claims.

**Rule 23(a)(3): Typicality**

"Typicality requires that the claims of the named class representatives be typical of those of the class; 'a class representative must be part of the class and possess the same interest and suffer the same injury as the class members.'" *Lienhart*, 255 F.3d at 146 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982)). "The premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class." *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 340 (4th Cir. 1998) (quoting *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998)). "Typicality does not require the plaintiff's claims to be perfectly identical to the claims of class members; however, 'when the variation in claim strikes at the heart of the respective causes of action,' the Fourth Circuit has readily denied class certification." *Melton ex rel. Dutton v. Carolina Power & Light Co.*, 283 F.R.D. 280, 287 (D.S.C. 2012) (quoting *Deiter v. Microsoft Corp.*, 436 F.3d 461, 467 (4th Cir. 2006)). "The typicality requirement is met if a plaintiff's 'claim arises from the same event or course of conduct that gives rise to the claims of other class members and is based on the same legal theory.'" *Parker v. Asbestos Processing, LLC*, C.A. No. 0:11-cv-01800-JFA, 2015 WL 127930, at *7 (D.S.C. Jan. 8, 2015) (quoting *Comer v. Life Ins. Co. of Ala.*, 2010 WL 233857, at *4 (D.S.C. Jan. 14, 2010)).

Defendant contends that Plaintiff lacks standing to bring a breach of contract claim because she has not been injured. ECF No. 61 at 37. Defendant points to her deposition testimony in which Plaintiff stated that her out-of-pocket expenses would have been the same had Defendant not applied the PSA in valuing her vehicle. *Id.* at 38. Defendant contends that, under either valuation, Plaintiff only paid the $2,000 deductible;

accordingly, any injury was suffered by the gap waiver company.  *Id.*  Defendant asserts that Plaintiff may not bring a claim for damages potentially owed to another.  *Id.*

With respect to whether Plaintiff has suffered an injury, the undersigned agrees with other courts that have found that "[h]istory and precedent support that a person who whose contractual rights have been violated has standing to sue the breaching party, regardless of whether the non-breaching party has suffered additional harm."  *Eletson Holdings, Inc. v. Levona Holdings Ltd.*, No. 23-CV-7331 (LJL), 2024 WL 532104, at *21 (S.D.N.Y. Feb. 9, 2024).  Moreover, Plaintiff's claims arise from the same course of conduct that gives rise to the claims of the other class members and are based upon the same legal theories.  Accordingly, the Court finds the typicality requirement has been satisfied.

**Rule 23(a)(4): Adequacy of Representation**

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent."  *Amchem*, 521 U.S. at 625.  "The principal factor in determining the adequacy of class representatives is whether the plaintiffs have the ability and commitment to prosecute the action vigorously."  *S.C. Nat'l Bank v. Stone*, 139 F.R.D. 325, 329 (D.S.C. 1991) (citing *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718 (11th Cir. 1987), *cert. denied*, 485 U.S. 959 (1988)).  "This inquiry involves two issues: (i) 'whether plaintiffs have any interest antagonistic to the rest of the class;' and (ii) whether plaintiffs' counsel are 'qualified, experienced and generally able to conduct the proposed litigation.'"

36

*Id.* at 330 (quoting *Kirkpatrick*, 827 F.2d at 726). "The adequacy of plaintiffs' counsel, like that of the individual plaintiffs, is presumed in the absence of specific proof to the contrary." *Id.* at 330–31 (citing *Falcon*, 626 F.2d at 376 n.8). "[C]ourts generally hold that the employment of competent counsel assures vigorous prosecution." *Id.* at 331.

Defendant argues that Plaintiff's waiver of claims on behalf of the proposed class and her damages model creates conflict with the class. ECF No. 61 at 39–41. Defendant further contends that some potential class members may have benefitted from the PSA. Defendant makes no argument regarding Plaintiff's counsel with respect to adequacy.

Here, the Court finds that the adequacy requirement has been met. With respect to Defendant's waiver argument, this action is being pursued pursuant to Rule 23(b)(3), which allows potential class members to opt-out of the litigation. As noted by other courts, the opt-out provision has been instrumental in finding the adequacy requirement is met. *See, e.g.*, *Gates v. Rohm & Haas Co.*, 265 F.R.D. 208, 218 (E.D. Pa. 2010). In similar cases, courts have determined that the adequacy requirement has been met despite the fact that other claims have been waived. *Drummond*, 2023 WL 5181596, at *9; *Volino*, 2023 WL 2532836, at *11.

The Court further finds that Plaintiff's proposed damages model does not bar class certification. The adequacy inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem,* 521 U.S. at 625; *see also Sharp Farms v. Speaks*, 917 F.3d 276, 295 (4th Cir. 2019). A conflict must be "fundamental" to defeat the adequacy requirement. *See Ward v. Dixie Nat'l Life Ins. Co.*, 595 F.3d 164, 180 (4th Cir. 2010). "A conflict is not fundamental when . . . all class

members share common objectives and the same factual and legal positions and have the same interest in establishing the liability of defendants." *Ward*, 595 F.3d at 180 (quotation and alteration omitted); *see also Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 430–31 (4th Cir. 2003).

This argument has been raised to and disregarded by another court, who did not find the alleged conflict was "fundamental." *Drummond*, 2023 WL 5181596, at *9. The undersigned also finds that the proposed conflict is speculative at this stage of the litigation. *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 184 (3d Cir. 2012).

The undersigned finds that the adequacy requirement is satisfied because Plaintiff's claims are consistent with those of the class; she has demonstrated that she is committed to prosecuting this litigation on behalf of the class; and she has hired competent, experienced, and qualified counsel. The Court further finds that Plaintiff's attorneys in this litigation have extensive experience prosecuting class actions and will vigorously represent Plaintiff and the class members in this action. Accordingly, the Court is satisfied that Plaintiff and her class counsel will fairly and adequately protect the interests of the class.

## CONCLUSION

For the reasons set forth above, Defendant's Motions to Exclude Declarations and Reports and Testimonies of Expert Witnesses [57], [59], [60], [100] are **DENIED**. Defendant's Motion to Exclude the Reports and Testimony of Todd Caputo and Kirk Felix [58] is **GRANTED in part and DENIED in part** as set out.

Plaintiff's Motion for Class Certification [50] is **GRANTED**.  Pursuant to Rule 23(b)(3), the Court certifies a class of plaintiffs consisting of

> All persons who made a first-party claim on a policy of insurance issued by Progressive Direct Insurance Company to a South Carolina resident who, from October 15, 2018 through the date an order granting class certification is entered, received compensation for the total loss of a covered vehicle, where that compensation was based on an Instant Report prepared by Mitchell (i.e. Report Code= "COMP") and the actual cash value was decreased based upon Projected Sold Adjustments to the comparable vehicles used to determine actual cash value.

Based on a review of Plaintiff's counsel's qualifications and experience provided in the record, the Court has considered the work Plaintiff's counsel has done in identifying and investigating potential claims in this action; counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in this action; counsel's knowledge of the applicable law; and the resources that counsel will commit to representing the class.  *See* Fed. R. Civ. P. 23(g)(1)(A).  As discussed above, the Court finds Plaintiff's counsel will fairly and adequately protect the interests of the class.  *See* Fed. R. Civ. P. 23(g)(4).  Accordingly, the Court hereby appoints Plaintiff as Class Representative and Plaintiff's counsel as Class Counsel, pursuant to Federal Rule of Civil Procedure 23(g).

The Court directs the parties to submit a Joint Notice Plan within 30 days.  If they are unable to agree, the parties may submit separate proposed Notice Plans for the Court's review within the same 30 days.

IT IS SO ORDERED.

s/ Donald C. Coggins, Jr.
United States District Judge

May 8, 2024
Spartanburg, South Carolina